## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**J.M. and E.M., individually and o/b/o C.M.,**

     **Plaintiffs,**

     **v.**

**SUMMIT CITY BOARD OF EDUCATION,**

     **Defendant.**

Civ. No. 19-00159 (KM) (ESK)

**OPINION**

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

     J.M. and E.M. ("Parents") are the parents of C.M., who was an elementary-school student when the events here began. The Parents sought to have C.M. classified as disabled and thus entitled to a free appropriate public education ("FAPE") based on an individualized education plan ("IEP") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The Summit City Board of Education ("District") determined that C.M. was not disabled, and the Parents challenged that determination through the IDEA's administrative process. After the Parents provided more evaluations of C.M. to the District, the District determined that C.M. was disabled and developed an IEP. The Administrative Law Judge ("ALJ") then upheld the District's original determination of non-disability and therefore did not reach the issue of the appropriateness of the later IEP. A year later, the Parents placed C.M. in private school.

     The Parents now bring four claims before this Court. They seek (Count I) a reversal of the ALJ's decision affirming the District's determination that C.M. was not disabled; (Count II) a declaration that the District violated C.M.'s rights under the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; (Count III) a declaratory judgment that the District must develop an IEP for C.M. based on the recommendations of the Parents' experts and reimburse them for the cost

of C.M.'s private school; and (Count IV) attorney's fees. The District moved to dismiss Count III, either for lack of jurisdiction or failure to state a claim, and to strike certain allegations related to Count III. (DE 55.) Subsequently, the Parents moved for partial summary judgment on Count I and summary judgment on Count II. (DE 70.) The District cross-moved for summary judgment on all claims. (DE 74.)

For the following reasons, the District's motion to dismiss Count III for lack of jurisdiction is **GRANTED**, the District's motion to strike is **DENIED**, the Parents' motion for summary judgment is **DENIED**, and the District's cross-motion for summary judgment is **GRANTED**.

## I.   BACKGROUND

### A. The IDEA

The IDEA requires states receiving federal education funding, like New Jersey, to ensure that students with disabilities receive a "free appropriate public education that emphasizes special education and related services designated to meet their unique needs." 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1); *see also Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 425–26 (3d Cir. 2013). The IDEA first requires that school districts "identif[y], locate[], and evaluate[]" children with disabilities. 20 U.S.C. 1412(a)(3)(A). If a child has a disability, then a state satisfies its duty to provide a FAPE by providing an IEP, which is "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). If parents are dissatisfied with the district's determinations or IEP, they may bring a challenge in a state administrative process and then seek review in court. *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66–67 (3d Cir. 2010).

### B. Facts

C.M. was enrolled in first grade at one of the District's schools for the 2015–2016 year. (Dist. SMF ¶ 1.)[1] Shortly after the school year began, C.M.

---

[1]     Certain citations to the record are abbreviated as follows:

had a behavioral incident. (*Id.* ¶ 7.) C.M., the school psychologist, Dr. Angela Paster, and his teacher, Heidi Klebaur, then developed some behavioral rules for C.M. and agreed that C.M. would receive rewards for following those rules. (*Id.* ¶¶ 11–14; Parents SMF ¶ 21.)

---

DE = docket entry

Am. Compl. = Amended Complaint (DE 50)

Dist. MTD Brf. = District's Brief in Support of its Motion to Dismiss, in part, and Strike Portions of the Complaint, in part (DE 55)

Parents MTD Opp. = Parents' Brief in Opposition to District's Motion to Dismiss and Strike (DE 59)

Dist. MTD Reply = District's Reply Brief in Further Support of its Motion to Dismiss, in part, and Strike Portions of the Complaint, in part (DE 63)

Parents SMF = Parents' Statement of Material Facts in Support of their Motion for Partial Summary Judgment (DE 70-1)

Parents SJ Brf. = Parents' Memorandum of Law in Support of Motion for Partial Summary Judgment on Count I and Summary Judgment on Count II (DE 70-2)

Dist. SMF = District's Counter Statement of Material Facts (DE 73-3)

Dist. SJ Brf. = District's Cross-Motion for Summary Judgment (DE 74-2)

Pet. = Parents' Due Process Petition, *J.M. v. Summit City Bd. of Educ.* (May 25, 2016), Exhibit R to the District's Cross-Motion for Summary Judgment (DE 73-22)

ALJ Op. = Final Decision, *J.M. v. Summit City Bd. of Educ.*, OAL Dkt. No. EDS 10588-16 (Oct. 12, 2018) (DE 70-13)

McGuffog Rep. = Dr. McGuffog's Neuropsychological Evaluation (Oct. 2015), Exhibit A to the District's Cross-Motion for Summary Judgment (DE 73-5)

Tr. A = Transcript of July 10, 2017 proceedings before the ALJ, Exhibit A to the Parents' Motion for Summary Judgment (DE 70-5)

Tr. B = Transcript of November 21, 2017 proceedings before the ALJ, Exhibit B to the Parents' Motion for Summary Judgment (DE 70-6)

Tr. D = Transcript of March 14, 2018 proceedings before the ALJ, Exhibit D to the Parents' Motion for Summary Judgment (DE 70-8)

Tr. E = Transcript of June 8, 2018 proceedings before the ALJ, Exhibit E to the Parents' Motion for Summary Judgment (DE 70-9)

Tr. F = Transcript of June 11, 2018 proceedings before the ALJ, Exhibit F to the Parents' Motion for Summary Judgment (DE 70-10)

Following that incident, Klebaur, Dr. Paster, and the school principal, Dr. Lauren Banker, met with the Parents to discuss C.M.'s behavior. (Dist. SMF ¶ 15; Parents SMF ¶ 24.) The Parents told them that C.M. previously had behavioral problems at daycare, struggled with homework, and likely had autism and ADHD. (Dist. SMF ¶ 16; Parents SMF ¶ 24.) In response, the District convened an Initial Intervention and Referral Services ("I&RS") meeting. (Dist. SMF ¶ 17; Parents SMF ¶ 32.)

Under I&RS, the District puts interventions or accommodations into place to address a student's difficulties. (Tr. A at 54–55.) Such interventions are available to all students, not only those already found eligible for special education. (*Id.* at 147; Tr. B at 15–16, 25–27.) The District monitors the student's progress and implements increasing interventions if necessary. If those progressive interventions are unsuccessful in allowing the student to access the general curriculum, then the student may be further evaluated for special education. (Tr. A at 54–55.) Special education usually entails a modification of curriculum that can also require that the student be removed from the general education setting. (Tr. B at 16–17, 111.) For C.M., the District implemented an incentive program, had C.M. attend a social skills group, and provided support in reading and writing. (DE 73-7, at 1.)

The Parents provided the District with evaluations conducted by Dr. Carolyn McGuffog, a neuropsychologist, who had met with C.M. after he had showed behavioral problems at daycare. (Dist. SMF ¶¶ 2, 5, 19–20; Parents SMF ¶ 9–12, 36.) Dr. McGuffog performed sixteen tests, measuring various skills, academic abilities, and traits. (McGuffog Rep. at 3.) She concluded that C.M. presented a "complex array of neurocognitive strengths and weaknesses that poses a [] diagnostic challenge." (*Id.* at 36.) She noted that some of his behaviors were "suggestive" of attention deficit hyperactivity disorder ("ADHD"), but that "an ADHD diagnosis does not capture other areas of developmental weaknesses." (*Id.* at 37.) She instead "proposed" a diagnosis of social language disorder but also noted that "[a]ll areas of deficiency" could be subsumed under

4

autism. (*Id.*) She recommended further evaluations, "behavioral supports in school," and "academic support in language arts." (*Id.*)

The District notified the Parents that it intended to further evaluate C.M. for a disability. (Dist. SMF ¶¶ 36–37.) The District explained that C.M. had difficulties in reading and writing and had exhibited behavioral and social problems, although interventions had helped. (DE 73-8, at 2.) To evaluate C.M., the District conducted multiple assessments:

- a social assessment that relied on records, parent and teacher interviews, and observations, showing that C.M. could mostly comply with directions and that, while he had some behavioral incidents, they occurred for only 5% of the schoolyear and were mitigated by the incentive program (DE 73-19, at 4);

- a psychological assessment that relied on records, an interview with C.M., and observations, showing that C.M. had "positive feelings towards his family and peers, the need to control other peoples' behaviors, and . . . difficulty keeping calm when he perceives that other people have treated him unfairly" (DE 73-21, at 6);

- an occupational therapy assessment that relied on observations and teacher reports, showing that C.M. could "safely negotiate his school environment" (DE 73-20, at 1); and

- a physical therapy services assessment that relied on a physical assessment, showing that C.M. had normal gross motor skills (DE 73-18, at 3).

The Parents and the District met in February 2016 to discuss whether C.M. was eligible for special education. (Dist. SMF ¶ 55; Parents SMF ¶ 219.) The District reviewed the assessments, Dr. McGuffog's report, other observations,[2] and records and determined that C.M. was not disabled. (DE 73-

---

[2] The District also considered an observation report from a private psychologist stating that C.M. had some struggles with maintaining attention in the classroom (DE

9, at 2.) The District stated that C.M.'s reading level had progressed and that, while his writing continued to be an area of weakness, assistance had proven successful. (*Id.*) The District emphasized that C.M. continued to benefit from the I&RS interventions. (*Id.*) Accordingly, the District recommended that C.M. continue to work with the I&RS team and follow their interventions. (*Id.*; *see also* Tr. A. at 109 (Dr. Paster testifying that "[b]ecause he was making progress in his current program and interventions were successful, . . . we didn't feel that specialized curriculum, specialized—special education was appropriate at the time"); Tr. B at 52 (Dr. Banker testifying similarly).)

The Parents disagreed. (DE 73-9, at 2.)

## C. The Administrative Process

To contest the District's determination, the Parents filed a due process petition in May 2016 with the New Jersey Department of Education. (Pet. at 1.) They claimed that by failing to find that C.M. was disabled, the District violated the IDEA, RA, and corresponding New Jersey law. (*Id.* at 18.) They thus sought a determination that C.M. is disabled and an order directing the District to develop an IEP based on Dr. McGuffog's recommendations. (*Id.* at 2.)

While the administrative process was ongoing through 2016 and into 2017, the Parents had C.M. further evaluated by Dr. McGuffog and Alana Fichtelberg, a speech pathologist. (DE 70-19, at 3–6.) Their evaluations showed continued struggles in reading, writing, and behavior, and Dr. McGuffog recommended several diagnoses, including autism, ADHD, and specific learning disorders. (*Id.*) In March 2017, the District referred C.M. to an evaluation with psychiatrist Dr. Ellen Pratt, who diagnosed C.M. with autism and ADHD. (*Id.* at 2–3.) Based on these evaluations, in April 2017, the District classified C.M. as IDEA-eligible due to autism and developed an IEP. (*Id.* at 13.) In August 2017, the Parents consented to the IEP but noted their disagreement

---

73-14, at 1–2; Tr. A. at 142–44.) But Dr. Paster explained that many of the observations were typical of any first grader. (Tr. A. at 142–44.)

with "the entire program as written and reserve[d] all rights under the law to challenge the program as necessary." (*Id.* at 27.)

The administrative process continued, and an ALJ held hearings through 2017 and 2018, with testimony from Dr. Paster, Dr. Banker, E.M., Fichtelberg, Dr. McGuffog, and experts and specialists from the District. (*Id.* at 2–16.) The issues presented in the hearings only related to whether C.M. was correctly classified in February 2016. (Tr. A at 5–24.) Indeed, in the Parents' opening statement two months after the IEP was developed, they so confined the issues (*id.* at 15–16) and stated that "[s]ince no IEP was offered on February 8, 2016, there is no IEP to consider" (*id.* at 22). Further, the Parents' expert witnesses, Fichtelberg and Dr. McGuffog, did not testify regarding the adequacy of the 2017 IEP, and questioning focused on whether, in their view and with hindsight, C.M. should have been classified as IDEA-eligible in February 2016. (*See, e.g.*, Tr. D at 88 (Parents' counsel explanation of how Fichtelberg's testimony related and was limited to the February 2016 eligibility determination); Tr. E at 108 (same as to Dr. McGuffog).) The Parents submitted Fichtelberg's and Dr. McGuffog's post-February 2016 reports, arguing that they showed a regression that indicated that C.M. was misclassified in February 2016, but they did not submit the 2017 IEP. (ALJ Op. at 11, 14, 26–27.)

The ALJ issued his decision in October 2018 and made the following conclusions relevant to this case:

- Dr. McGuffog's testimony was not entitled to "a great deal of weight" because (1) she appeared upset that her recommendations were not accepted, (2) she testified that she was not given the opportunity to adequately participate in the eligibility meetings but that testimony was contradicted by other witnesses, and (3) she testified that she recommended that C.M. should receive special education but her report contradicted that recommendation. (*Id.* at 18.)

7

- While the Parents presented evidence post-dating the February 2016 meeting, the ALJ would only consider the information available to the District when it made its eligibility determination. (*Id.* at 24.)

- The District appropriately considered C.M.'s needs and worked to assist him, as evinced by the I&RS meeting and subsequent improvements. (*Id.*) Based on C.M.'s progress with existing accommodations, the District correctly determined that C.M. was not eligible for special education in February 2016. (*Id.* at 24–25.)

The ALJ therefore dismissed the Parents' due process petition. (*Id.*)

**D. Proceedings in this Court**

The Parents sought review of the ALJ's decision in this Court. (DE 1.) Their Amended Complaint recounts the events described above and alleges that, following the administrative process, they found the 2017 IEP inadequate and placed C.M. in private school in fall 2019 per Dr. McGuffog's recommendation. (Am. Compl. ¶¶ 259–70.) That is, they placed C.M. in private school one year after the ALJ decision and two years after an IEP was developed. They assert the following claims:

- Count I: The District violated the IDEA by failing to classify him as disabled in February 2016 and the ALJ's decision requires reversal. (*Id.* ¶¶ 230–37.)

- Count II: The District's failure to classify C.M. violated the RA. (*Id.* ¶¶ 238–43.)

- Count III: Because the District never developed an IEP that reflected Dr. McGuffog's recommendations, the Parents are entitled to a declaratory judgment under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, that the District must develop such an IEP for C.M. Because Dr. McGuffog recommended that C.M. be placed in private school, and the Parents unilaterally did so, they are also entitled to reimbursement for C.M.'s private schooling. (*Id.* ¶¶ 244–76.)

- Count IV: If successful on the IDEA claims, the Parents are entitled to attorney's fees. (*Id.* ¶¶ 277–79.)

After much procedural maneuvering, now before the Court are (1) the District's motion to dismiss Count III and to strike related factual allegations, (2) the Parents' motion for partial summary judgment on Count I and full summary judgment on Count II, and (3) the District's opposition and cross-motion for summary judgment on all claims.

## II.  STANDARDS OF REVIEW

### A. Motion to Dismiss for Lack of Jurisdiction

Under Rule 12(b)(1), a defendant may move to dismiss on the grounds that the court lacks subject matter jurisdiction over the dispute. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) attack can be facial where the defendant "attacks the complaint on its face without contesting its alleged facts." *Hartig Drug Co. v. Senju Pharms. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). Or a Rule 12(b)(1) attack can be factual where the defendant "attacks allegations underlying the assertion of jurisdiction in the complaint." *Id.* "[W]hen reviewing a factual challenge, "a court may weigh and consider evidence outside the pleadings," and the plaintiff bears the burden of showing that jurisdiction exists. *Id.* (quoting *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).

The District frames its Rule 12(b)(1) motion as facial attack. (Dist. MTD Reply at 2.) Indeed, the District argues that the Amended Complaint on its face and the ALJ's decision, a document integral to and explicitly relied upon in the Complaint, establish that the Parents have failed to exhaust their remedies on Count III. (*Id.* at 2–3.) *See generally Doe v. Univ. of Sci.*, 961 F.3d 203, 208 (3d Cir. 2020) (on a Rule 12(b)(6) motion to dismiss, "document[s] integral to or explicitly relied upon in the complaint" may be considered (citation omitted)). Although some courts have treated Rule 12(b)(1) motions based on IDEA exhaustion as a factual challenge, *J.Q. v. Wash. Twp. Sch. Dist.*, 92 F. Supp. 3d 241, 245 (D.N.J. 2015) (collecting cases), the Third Circuit has noted that exhaustion can properly be addressed as facial attack, *Batchelor v. Rose Tree*

*Media Sch. Dist.*, 759 F.3d 266, 271 & n.6 (3d Cir. 2014). Accordingly, I treat the District's Rule 12(b)(1) motion as a facial attack.

### B. Motion for Summary Judgment

"[W]hen there is no new evidence presented to the district court . . . a motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (internal quotations and citations omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). "In cases arising under the IDEA, we apply a modified de novo standard of review, giving due weight and deference to the findings in the administrative proceedings." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citation omitted). A reviewing court must "accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal quotations and citations omitted). Conclusions of law are given plenary review. *Id.* The ALJ's factual findings "are to be considered prima facie correct, and if [a court does] not adhere to those findings, [it] must explain why." *Id.* (internal citations omitted).

That said, the court cannot merely defer to the ALJ. A court "does not use the substantial evidence standard typically applied in the review of administrative agency decisions, but instead must decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (internal quotation and citation omitted). The party seeking relief or challenging the administrative decision bears the burden of persuasion. *D.K.*, 696 F.3d at 243 (citations omitted).

## III. DISCUSSION

### A. Motion to Strike

Preliminarily, the District moves to strike allegations concerning facts that post-date the February 2016 eligibility determination. (Dist. MTD Brf. at 16.) I may "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[M]otions to strike under Rule

12(f) are disfavored and should generally be denied 'unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or . . . confuse the issues.'" *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.* 449 F. Supp. 3d 449, 459 (D.N.J. 2020) (quoting *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002)). The District moves to strike paragraphs 129 to 133 and 168 to 229, which concern evaluations C.M. received post-February 2016 that informed his later classification as autistic, and paragraphs 244 to 276, which concern the facts supporting Count III and the Parent's placement of C.M. in private school.

I will deny the motion to strike as such. First, the allegations regarding evaluations C.M. received post-February 2016 (Am. Compl. ¶¶ 129–33, 168–229) are relevant to the Parents' claim in Count I that the ALJ should have considered these evaluations in reviewing the District's disability determination (*id.* ¶ 237(h)). The Parents may or may not be correct, but those factual allegations are still necessary to review their claim, so they are not "immaterial." Fed. R. Civ. P. 12(f). Second, the allegations are relevant to the Parents' version of the issues at stake in Count III; although I will dismiss Count III, there is no need to strike the allegations made in support of it, as their mere presence produces neither scandal nor prejudice to any party.

## B. Cross-Motions for Summary Judgment on Count I

Count I directly challenges the District's determination that C.M. was not disabled as of February 2016 and the ALJ's affirmance of that determination. (Am. Compl. ¶¶ 230–37.) The IDEA and implementing regulations set forth procedures school districts should follow to identify and evaluate children with disabilities. *D.K.*, 696 F.3d at 250. A child is disabled if (1) he[3] has an impairment listed in the IDEA, such as a specific learning disability, autism, or ADHD, (2) the impairment adversely affects his educational performance, and (3) he needs special education. 20 U.S.C. § 1401(3)(A); N.J.A.C. § 6A:14-3.5(c);

---

[3]      Because C.M. happens to be male, I will use the male pronoun even when referring to a child generically.

*see also M.S. v. Randolph Bd. of Educ.*, Civ. No. 18-13029, 2019 WL 4785742, at *8 (D.N.J. Sept. 30, 2019).[4] I will address each prong in turn,[5] but first I must address the scope of evidence considered by the ALJ.

### 1. Scope of Evidence Considered

During the administrative process, the Parents submitted evidence relating to C.M.'s alleged disabilities that post-dated the February 2016 meeting (namely reports from Fichtelberg and Dr. McGuffog), which the ALJ did not consider. (ALJ Decision at 24.) They argue that such evidence should nevertheless be considered by the Court in reviewing the District's determinations. (Parents SJ Brf. at 23–27.) I denied the motion to strike these allegations in the first instance, *see* Section III.A, *supra*; upon considering them, however, I do not agree that they were relevant to the ALJ's decision.

Neither the Third Circuit nor the Supreme Court has addressed whether courts or an ALJ should consider post-hoc evidence when reviewing an eligibility determination. In a related context, the Third Circuit has held that courts should review the reasonableness of the speed with which a district identified and evaluated a child "in light of the information and resources possessed by the district at a given point in time." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (internal quotations and citation omitted). *Ridley*

---

[4]     Because the IDEA requires that a state has "a system in place to identify, locate, and evaluate all children with disabilities," New Jersey has procedures and specific definitions of disability in regulations, which courts follow. *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 338–39 (3d Cir. 2003); *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 449–50 (D.N.J. 2011).

[5]     The District's presentation at the hearing focused on the third prong, need for special education. (*E.g.*, Tr. A at 5–6, 12–13, 132–33; Tr. F at 71–72.) I will, however, address the other two prongs because (1) in the summary judgment motions, the Parents allege a variety of procedural violations related to those prongs, which the District defends against, *see C.H.*, 606 F.3d at 66–67 (explaining how procedural violations may give rise to some relief under the IDEA); (2) neither the non-testimonial evidence nor the ALJ decision specified which prong the Parents failed to meet; and (3) Parents would need to prove all three to show that C.M. was disabled and that the District denied him a FAPE by not classifying him as such.

dealt with whether a district *timely* identified a child as disabled, while this case deals with whether the District *correctly* identified a child as disabled. Nonetheless, *Ridley* suggests that courts should review whether a district identified a child as disabled based on then-available information. Indeed, the Fifth and Ninth Circuits have squarely held that review of an eligibility determination is limited to information available at the time of evaluation because "[s]ubsequent events do not determine ex ante reasonableness in the eligibility context." *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 214–15 (5th Cir. 2019); *see also L.J. by and through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017).

In response, the Parents rely on *Susan N.*, which held that a court reviewing an IEP may consider a child's later progress to determine "whether the original IEP was reasonably calculated to afford some educational benefit." 70 F.3d at 762 (citation and emphasis omitted). *Susan N.* does not dictate that the ALJ was required to consider post-February 2016 evidence, for two reasons: First, *Susan N.*'s approval of later-acquired evidence is limited to evaluating the reasonableness and efficacy of an IEP. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 555–56 (3d Cir. 2010); *T.O. v. Summit City Bd. of Educ.*, Civ. No. 12-5350, 2015 WL 4548780, at *17 (D.N.J. July 27, 2015). Second, there is good reason not to extend *Susan N.* because, as the Fifth Circuit explained, "[t]he IEP appropriateness inquiry . . . considers staff implementation and student performance over a period of time whereas eligibility is a snapshot of the student's condition at the time of the eligibility determination." *Lisa M.*, 924 F.3d at 215 (internal footnote omitted). And that makes sense; *if* a child is disabled as of a certain date, *then* the functioning of an appropriate IEP may well change over time (ideally because the IEP is working and the child is progressing).

Accordingly, the ALJ did not err in focusing on the information available in February 2016 in connection with the eligibility determination, and I will similarly limit my review.

## 2. Impairment

Turning to the eligibility determination itself, the first prong requires me to decide whether C.M. had a specific learning disability, autism, or ADHD, and whether the District should have further evaluated him for those impairments. *See* 20 U.S.C. § 1401(3)(A)(i); N.J.A.C. § 6A:14-3.5(c).

### i. *Specific Learning Disability*

The Parents argue that C.M. qualified as having a "specific learning disability." (Parents SJ Brf. at 8–10.) A "specific learning disability" is defined as a "disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, [or] spell." N.J.A.C. § 6A:14-3.5(c)(12); *see also* 34 C.F.R. § 300.8(c)(10)(i). There are two methods to determine whether a child has a specific learning disability. *V.M.*, 2014 WL 3020189, at *4. "The first is the 'severe discrepancy' approach, by which [the district] determine[s] whether there is a 'severe discrepancy . . . between the student's current achievement and intellectual ability in one or more" listed areas (for example, reading comprehension). *Id.* (quoting N.J.A.C. § 6A:14-3.5(c)(12)(i)). "Alternatively, the [district] may also 'utilize[e] a response to scientifically based interventions methodology.'" *Id.* (citing N.J.A.C. § 6A:14-3.5(c)(12)(ii)).[6] Either method is permissible. *Id.* at *4 n.2; *see also* 34 C.F.R. § 300.307(a).

The Parents argue that they presented evidence showing a severe discrepancy between C.M.'s scores on standardized evaluations and his IQ score. (Parents SJ Brf. at 9–10.) The District, however, used the response-to-intervention methodology. (*E.g.*, Tr. A at 54–56.) The Parents argue that the District was required to rely on the severe-discrepancy data they provided. (Parents SJ Reply at 13–14.) The IDEA is clear, however, that the District has

---

[6]     With this methodology, a student is provided increasing levels of support while his progress is monitored, and a team assesses whether interventions are successful before determining that special education is necessary. *Lisa M.*, 924 F.3d at 209.

more methodological leeway; "a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability." 20 U.S.C. § 1414(b)(6)(A). Because the District choice of methodology was permissible, and the Parents have presented no arguments attacking the methodology which the District did employ, I cannot conclude that the District erred in determining that C.M. did not have a specific learning disability.

### ii.   *Autism*

The Parents argue that C.M. qualified as autistic[7] because Dr. McGuffog gave C.M. a "rule out" diagnosis—*i.e.,* an opinion that an autism diagnosis could not be ruled out. (Parents SJ Brf. at 10–11.) The District, as it was required to do, considered a variety of assessments, not just Dr. McGuffog's report, when making its determination. *See V.M.*, 2014 WL 3020189, at *4 ("[F]ederal regulations require school districts to draw upon a wide range of the data collected in its evaluation . . . . New Jersey's regulations go one step farther, providing that '[c]lassification shall be based on *all assessments conducted* . . . .'" (quoting N.J.A.C. § 6A:14-3.5(c))). Those assessments showed that (1) C.M. could mostly comply with directions (DE 73-19, at 4); (2) his behavioral incidents occurred only 5% of the schoolyear and were mitigated by the incentive program (*id.*); (3) he was able to have positive and normal social interactions and relationships with his peers and teacher (DE 73-21, at 5–6); and (4) while he struggled with reading and writing, he could adequately express himself orally (*see id.*) The District did not ignore Dr. McGuffog's report and data, but considered them in conjunction with its own assessments. (*E.g.*, Tr. F at 54–57.) Thus, there was a reasonable basis to find that C.M.'s communication and interaction skills were not so "significantly impact[ed]" as to qualify as autism. N.J.A.C. § 6A:14-3.5(c)(2); *see also Timothy F. v. Antietam*

---

[7]   "'Autism' means a pervasive developmental disability that significantly impacts verbal and nonverbal communication and social interaction . . . ." N.J.A.C. § 6A:14-3.5(c)(2); *see also* 34 C.F.R. § 300.8(b)(1)(i).

*Sch. Dist.*, No. 12-2719, 2014 WL 1301955, at *6 (E.D. Pa. Mar. 31, 2014) (explaining that, when courts review eligibility determinations, they review the evidence relied on and "the general logic and reasonability of the district's and hearing officer's findings" (citations omitted)); *cf. Hansen ex rel. J.H. v. Republic R-III Sch. Dist.*, 632 F.3d 1024, 1027–28 (8th Cir. 2011) (rule-out diagnosis, along with formal diagnosis and observation of behaviors, supported conclusion that student had disability).

The Parents also argue that Dr. McGuffog's rule-out diagnosis at least required further evaluation, and that by failing to conduct autism-specific evaluations, the District violated its "Child Find" obligations. The Child Find obligation requires that school districts "identif[y], locate[], and evaluate[]" children with disabilities. 20 U.S.C. 1412(a)(3)(A). It is an independent requirement; "failure to comply with Child Find may constitute a procedural violation of the IDEA." *D.K.*, 696 F.3d at 249. Nonetheless, as explained, the District conducted multiple assessments after receiving Dr. McGuffog's report to determine whether C.M. was disabled, so there was no violation of Child Find. *See id.* at 251 (district did not violate Child Find when it performed multiple tests, even though the parents demanded another particular test). And C.M.'s later classification as autistic does not render the District's earlier determination inadequate. *Id.* Accordingly, there was neither error in the District's determination that C.M. was not eligible as autistic in February 2016 nor a violation of the District's Child Find obligations.[8]

---

[8]     The Parents also argue that the District violated its Child Find obligations because, between February 2016 and August 2017, they provided the District with more evidence of C.M.'s disabilities (reports from Dr. McGuffog and Fichtelberg), yet the District did not issue an IEP until August 2017. (Parents SJ Brf. at 27–28.) This argument fails for three reasons: (1) This theory is not well-pleaded in the Amended Complaint because Count I only mentions Child Find when listing the alleged errors in the ALJ decision (Am. Compl. ¶ 237(d)), but the ALJ decision did not address the District's conduct post-February 2016 (ALJ Op. at 24). *See Berrada v. Cohen*, 792 F. App'x 158, 161 n.3 (3d Cir. 2019) (declining to consider theory of liability at summary judgment when the complaint did not adequately encompass that theory (citation omitted)). (2) Even if this claim were pleaded, the ALJ only addressed the District's

### iii.    ADHD

The Parents argue that C.M. had ADHD.[9] (Parents SJ Brf. at 12.) As with their autism argument, the Parents rely on a rule-out diagnosis by Dr. McGuffog, this one for ADHD. (*Id.*) For the same reasons as set forth above, that argument fails; despite the rule-out diagnosis, the District and the ALJ were entitled to rely on other evidence which indicated that C.M. did not exhibit ADHD in February 2016. None of the District's assessments noted a significant struggle with attention. It is true that a private psychologist found attention difficulties, but the District considered those observations in the context of the other evidence and concluded that C.M.'s attention regulation was fairly typical for his age. (*See* Tr. A. at 142–44.) Accordingly, when considering all the evidence, the District could reasonably conclude that C.M. did not have ADHD. *See Timothy F.* 2014 WL 1301955, at *6.

The ADHD argument fails for the additional reason that "[a] medical assessment documenting the health problem is required." N.J.A.C. § 6A:14-3.5(c)(9). Dr. McGuffog, a neuropsychologist, is not a medical doctor, so her report would not seem to qualify as a "medical assessment." In any event, her report does not go so far as to diagnose C.M. with ADHD. The regulation requires "documenting the health *problem*" (here, ADHD), which at least suggests that a more formal diagnosis is necessary.

---

February 2016 eligibility determination, so this claim is unexhausted. *See* Section III.D, *infra.* (3) The claim would fail on the merits because the IEP document indicated that C.M. was evaluated by Dr. Platt just two months after Dr. McGuffog diagnosed him and the IEP meeting was convened just a month later (DE 70-19, at 2–4); such a timeframe is not unreasonable. *See Ridley*, 680 F.3d at 271–72 (explaining that courts only review the time a district takes to identify and evaluate a child for reasonableness).

[9]     20 U.S.C. § 1401(3)(A) (defining "child with a disability" as a child with "other health impairments"); N.J.A.C. § 6A:14-3.5(c)(9) ("'Other health impairment' means a disability characterized by having limited strength, vitality, or alertness . . . due to chronic or acute health problems, such as attention deficit hyperactivity disorder . . . .").

For the reasons outlined above, I will affirm the District's determination that C.M. did not qualify on the basis of having ADHD.

### 3. Adverse Effects

Even assuming that C.M. had an impairment, the Parents had to show that the impairment "adversely affect[ed] [his] educational performance." N.J.A.C. § 6A:14-3.5(c). Neither the IDEA nor regulations define "adversely affect." *E.g.*, *M.S.*, 2019 WL 4785742, at *9. In surveying case law, however, Judge Hayden articulated that "[g]enerally, . . . when students' academics do not decline . . . that consistency is usually found to signal that their disability does not adversely affect their educational performance." *Id.* at *9. Here, the District's assessments showed that C.M.'s reading level progressed and that, while his writing continued to be an area of weakness, assistance had proved successful. (DE 73-9, at 2.) Due to this improvement and consistency, any impairment was not adversely affecting C.M.'s educational performance. *See Ridley*, 680 F.3d at 272 (finding no disability when "although areas of weakness were found, [the child's] academic skills were generally considered to be in the average range").[10]

### 4. Need for Special Education

Finally, the IDEA requires a finding that C.M. "needs special education and related services" as a result of an impairment. 20 U.S.C. § 1401(3)(A)(ii). "Special education" means "specially designed instruction . . . to meet the unique needs of a child with a disability." *Id.* § 1401(29). "Specially designed instruction" means "adapting, as appropriate to the needs of an eligible child . . . , the content, methodology, or delivery of instruction—(i) To address

---

[10]    The Parents ask me to consider adverse effects on C.M.'s non-academic performance (*i.e.*, behavior), relying on policy letters from the Department of Education, which they argue are entitled to deference. (Parents SJ Brf. at 14.) Without wading into the thicket of deference, *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019), I will assume for analysis that such deference applies. Even so, the District could conclude that any impairments did not adversely affect C.M.'s behavior because his behavioral incidents occurred only 5% of the schoolyear and were mitigated by the incentive program. (DE 73-19, at 4.)

the unique needs of the child that result from the child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet . . . educational standards." 34 C.F.R. § 300.39(3).

There is little guidance on what it means to *need* special education. *Lisa M.*, 924 F.3d at 215. Persuasive authority instructs that a child "needs special education" if he cannot attain educational standards in the general education environment. *See Durbow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1194–95 (11th Cir. 2018); *L.J.*, 850 F.3d at 1004–05; *Lisa M.*, 924 F.3d at 218; *cf. D.K.*, 696 F.3d at 252 (district did not fail to identify child as disabled when it offered him accommodations "en route to eventually finding a disability"); *Ridley*, 680 F.3d at 272 (affirming ALJ decision that no child find violation occurred when the district "address[ed] [a student's] needs and provid[ed] appropriate instruction and interventions before rushing to special education identification").

The District reasonably concluded that C.M. did not "need special education" in February 2016. C.M. was progressing in the District with interventions that fell short of "special education." All of the accommodations which the District provided for C.M., both academic and behavioral, were available as part of the general education program. (Tr. A at 147; Tr. B at 15–16, 25–27.) *See McIntyre v. Eugene Sch. Dist. 4J*, --- F.3d ---, No. 19-35186, 2020 WL 5651279, at *8 (9th Cir. Sept. 23, 2020) (holding that not all accommodations qualify as "special education"). Accordingly, there was no "need" to move him to a special education setting or modify the curriculum.

The Parents do not take issue with how the District defines "special education" or determines a child's need for it. Instead, they argue that C.M. needed special education based almost entirely on Dr. McGuffog's observations of impairments and her recommendations. (Parents SJ Brf. at 16–22.) As a result, the Parents have not presented a basis to disturb the District's determination, because they fail to engage with the relevant legal standard and the crux of the District's case before the ALJ. Moreover, there is nothing in the

IDEA or related case law instructing that a private evaluator's recommendation alone satisfies the statutory standard that a child does "need special education." What is more, Dr. McGuffog's report did *not* even recommend special education, but only certain accommodations. (*See* McGuffog Rep. at 37–39.)[11] That Dr. McGuffog observed evidence of impairments is insufficient—the Parents needed to establish that C.M. needed special education, outside of what was available in the District's general educational program, to address those impairments. *See D.S. Neptune Twp. Bd. of Educ.*, 264 F. App'x 186, 189 (3d Cir. 2008). The Parents' statement that "C.M. needed special education because he has ADHD" (Parents SJ Brf. at 18) is not enough.

* * *

In sum, the District's determination that C.M. was not disabled and did not need special education, and the ALJ's affirmance thereof, was supported by a preponderance of evidence and comported with the statutory standard. Accordingly, I will affirm the ALJ decision and grant the District summary judgment on Count I.

## C. Cross-Motions for Summary Judgment on Count II

The Parents claim that the District's failure to classify C.M. as disabled also violated the Rehabilitation Act. (Am. Compl. ¶¶ 238–43.) The RA prohibits discrimination or exclusion from programs on the basis of disability. 29 U.S.C.

---

[11]   Dr. McGuffog damaged her credibility with the ALJ by testifying to the contrary. (ALJ Op. at 18, 24.) The Parents take issue with the ALJ's adverse credibility finding with respect to Dr. McGuffog. (ALJ Decision at 18; Parents SJ Brf. at 31–35.) However, I "must accept the [ALJ's] credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *D.K.*, 696 F.3d at 243 (citation omitted). As relevant here, the ALJ gave little weight to Dr. McGuffog's testimony because she testified that C.M. needed special education, but "[a] fair reading of her first report does not reveal an unequivocal recommendation for special education." (ALJ Op. at 18.) The report itself supports the ALJ's conclusion; there is no mention of special education, only recommendations for certain interventions (McGuffog Rep. at 37) which, in that particular District, are available as part of the general education program.

§ 794(a).[12] An RA claim requires, among other things, that the plaintiff be "disabled," *Ridley*, 680 F.3d at 280, meaning that he "has a physical or mental impairment that substantially limits one or more major life activities," *Weidow v. Scranton Sch. Dist.*, 460 F. App'x 181, 185 (3d Cir. 2012) (internal quotation marks and citation omitted). Although the RA and IDEA definitions of disability diverge in some respects, they both require an impairment. *Compare* 29 U.S.C. § 705(20)(B), *with* 20 U.S.C. § 1401(3); *see also B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016). For the RA, a mental impairment includes "any mental or psychological disorder, such as intellectual disability . . . and specific learning disabilities." 34 C.F.R. § 104.3(j)(2)(i)(B). Assuming that the impairments described above qualify, the Parents have not shown that, based on the evidence in February 2016, C.M. suffered from any of those impairments. As a result, their RA claim fails. *Cf. D.K.*, 696 F.3d at 253 n.8 ("[O]ur finding that the School District did not deny D.K. a FAPE is equally dispositive of Plaintiffs' [RA] claim.").

The RA claim fails for an additional reason: The Parents have put forward no argument or evidence showing that any impairment "substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B); *see also B.C.*, 837 F.3d at 159. The IDEA does not use this "substantially limits" definition, so even if plaintiff shows that she is disabled under the IDEA, that showing "does not relieve [p]laintiff of her burden [under the RA] of proving by a preponderance of the evidence" that she faces a substantial limitation. *Bowers v. NCAA*, 563 F. Supp. 2d 508, 533 (D.N.J. 2008); *see Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007)

---

[12]     "[A] party may use the same conduct as the basis for claims under both the IDEA and the RA," including denial of a FAPE. *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). If the gravamen of the RA claim is denial of a FAPE, then the claim must be exhausted through the IDEA process. *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 133–34 (3d Cir. 2017). The Parents allege that the District violated the RA by failing to provide a FAPE. (Am. Compl. ¶¶ 241–43) Because they presented the RA claim in their due process petition (Pet. at 18), I find that the claim was exhausted.

("[E]ven in cases also brought under the IDEA, . . . a plaintiff must still prove that there was a violation of the RA.").

In their moving brief, the Parents merely assert that they are entitled to summary judgment on their RA claim because they should also succeed on their IDEA claim. (Parents SJ Brf. at 35.) The one does not necessarily imply the other; the "substantially limits" inquiry involves specific, additional standards and facts. *See generally Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 258–59 (3d Cir. 2020). Still, the Parents make no arguments along those lines. Because the Parents bore the burden to prove this element and made no attempt to carry that burden, their claim fails. *See Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016); *Yates Real Estate, Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 913 n.28 (D.N.J. 2019).

### D. Motion to Dismiss Count III

The District argues that the Court lacks jurisdiction over Count III because the Parents did not exhaust that claim before the ALJ. (Dist. MTD Brf. at 4–12.) Specifically, the District contends that Count III asks for a specific IEP and reimbursement for C.M.'s private education post-July 2019, but the only issue considered by the ALJ was whether C.M. was disabled as of February 2016. (*Id.* at 9–10.) I agree and conclude that (1) exhaustion is required for Count III, (2) the Parents did not exhaust that claim, and (3) no exception to the exhaustion requirement applies. Count III will be dismissed.

#### 1. Exhaustion Requirement

I first must decide whether an exhaustion requirement applies to Count III, which seeks a declaratory judgment under the DJA. Federal courts only have jurisdiction over IDEA claims which plaintiffs have exhausted in their administrative proceeding. *Batchelor*, 759 F.3d at 272. The exhaustion requirement applies to non-IDEA claims if "the gravamen of the plaintiff's suit" is the denial of FAPE. *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131 (3d Cir. 2017) (quoting *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017)).

The gravamen of Count III is the denial of a FAPE. Count III seeks a declaration that "the District is obligated to develop an IEP for C.M." and, as a remedy for the District's failure to do so, reimbursement of private-school tuition. (Am. Compl. ¶ 275.) "The state administers a FAPE by developing an IEP for every child with disabilities." *Wellman*, 877 F.3d at 128 n.4 (citing 20 U.S.C. § 1414(d)). It follows that the Parents' claim that the District failed to provide an IEP, at least under these circumstances, is equivalent to a claim that the District denied C.M. a FAPE. Further, to be entitled to reimbursement for private school tuition, the Parents must show that the District wrongfully failed to provide D.M. with a FAPE. *See P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 739 & n.4 (3d Cir. 2009).

It makes no difference that Count III is brought under the Declaratory Judgment Act; the DJA is not a standalone source of rights, but a procedural vehicle for litigants to seek a declaration of their rights under some other law—here, the IDEA. *See CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 628 (3d Cir. 2013); *In re: Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 740 (D.N.J. 2016). Thus, for the Court to hear Count III, that IDEA claim must have been exhausted.

### 2. Actual Exhaustion

The next question is whether the Parents in fact exhausted that claim. The Parents argue that they presented the ALJ with the issue of whether the District was obligated to develop an IEP according to their experts' recommendations. (Parent MTD Opp. at 10–17.) The Amended Complaint alleges, and the District does not disagree, that the ALJ "never ruled on this request." (Am. Compl. ¶ 3.) Lacking direct Third Circuit authority, I analyze the statutory language and persuasive authority, and conclude that the Parents have not exhausted Count III.

#### i. *Statutory Language*

The exhaustion requirement is a product of the statute, so I begin with the statutory language. *Fry*, 137 S. Ct. at 753. Section 1415(i)(2)(A) provides

that "any party aggrieved by the findings and decision" of an ALJ may "bring a civil action with respect to the complaint presented pursuant to [the ALJ]." Section 1415(*l*) clarifies that the same procedure applies to claims brought under other federal laws "protecting the rights of children with disabilities . . . seeking relief that is also available under [the IDEA]." *See also Wellman*, 877 F.3d at 131.

Section 1415(i)(2)(A) indicates that a court's scope of review is limited to what was presented in the administrative complaint as well as the ultimate "findings and decision" of the ALJ. Put another way, anything outside the complaint or findings and decision of the ALJ has not been exhausted. This is so because § 1415(i)(2)(A) gives this court jurisdiction over an "action *with respect to the complaint presented*" to the ALJ. 20 U.S.C. § 1415(i)(2)(A) (emphasis added); *Batchelor*, 759 F.3d at 272. The language "with respect to" signifies that such jurisdiction is confined to the "complaint presented" to the ALJ. *See V.M. ex rel. B.M. v. Sparta Twp. Bd. of Educ.*, Civ. No. 12-892, 2014 WL 3020189, at *5 (D.N.J. July 3, 2014). Further, because only those who have been "aggrieved by the findings and decision" of an ALJ may bring an action, the statute directs that my review is confined to the findings and decision of the ALJ on the issues presented in the complaint.

Applying this language, I find that the Parents have not exhausted Count III. Their due process petition presented a narrow claim to the ALJ: a challenge to "the District's determination that C.M. was not eligible for special education," *i.e.*, not disabled, as of February 2016. (Am. Compl. ¶ 249.) Thus, the "complaint presented" to the ALJ claimed that the District violated the IDEA by failing to identify him as disabled. Although an IEP was issued and implemented while the administrative process was ongoing, there is no indication that the Parents sought to amend their petition to include a challenge to that IEP or even that they directed the ALJ's attention to that IEP. The "findings and decision" of the ALJ are equally circumscribed because the

ALJ only considered evidence available at the time of the eligibility determination. (*Id.* ¶ 257.)

As described in more detail at pp. 7–8, *supra*, the hearings related only to the classification in February 2016 (Tr. A at 5–24); the Parents' opening statement (delivered two months after the IEP was developed), was confined to that issue (*id.* at 15–16); the same opening statement acknowledged that "[s]ince no IEP was offered on February 8, 2016, there is no IEP to consider" (*id.* at 22); the Parents' expert witnesses, Fichtelberg and Dr. McGuffog, did not testify regarding the adequacy of the 2017 IEP (*see, e.g.*, Tr. D at 88 (Parents' counsel explanation of how Fichtelberg's testimony related and was limited to the February 2016 eligibility determination); Tr. E at 108 (same as to Dr. McGuffog)); and the Parents submitted Fichtelberg's and Dr. McGuffog's post-February 2016 reports to support their argument that C.M. was misclassified in February 2016, but they did not submit the 2017 IEP (ALJ Op. at 11, 14, 26–27).

The ALJ therefore never considered or ruled on a claim relating to a later IEP for C.M., because he was not asked to do so. (*Id.* ¶¶ 2–3.) As a result, the only exhausted issue before the Court is whether C.M. was eligible in February 2016.

Despite the narrowness of their administrative *claim*, the Parents argue that, because their petition sought the same *relief* as Count III (namely, an IEP that considers the recommendations of their experts), they have exhausted Count III. (*E.g.*, Parents MTD Opp. at 10.) True, a finding by the ALJ that C.M. was disabled would have required the District to develop an IEP, and the Parents would have sought such relief in the event the ALJ overturned the February 2016 finding that C.M. was not disabled. But the ALJ found that the District had not erred, and therefore was never called upon to hear evidence or rule regarding an IEP. Because the ALJ did not reach the IEP, neither do I. Absent some error in the finding of non-disability, the issue of what IEP the hypothetical February 2016 disability would have required is not on the table.

### ii.   *Persuasive Authority*

Persuasive authority confirms that conclusion. Some courts have taken a fairly categorical approach that issues raised before but not ruled on by an ALJ are not exhausted. *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 559 F. Supp. 2d 634, 644 (E.D. Pa. 2008) (collecting cases). In *Centennial*, parents filed a due process petition alleging that a student was disabled and thus entitled to a certain procedural protections; because the ALJ only decided whether the student was disabled, the court held that the issue of whether the student was due those protections was not exhausted. *Id.* at 644. Other courts have taken a less categorical approach, holding that "substantially similar persisting issues that have already been raised do not require reexhaustion." *J.N. ex rel. J.N. v. Penn-Delco Sch. Dist.*, 57 F. Supp. 3d 475, 479 (E.D. Pa. 2014). But those less categorical cases all, more or less, dealt with the following scenario: A parent challenges the adequacy of IEP before an ALJ; by the time they reach federal court a different IEP is in place; and the court hears claims based on the new IEP because the issues and facts are similar enough to the exhausted IEP. *See, e.g., id.*; *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 186 n.9 (1982); *Me. Sch. Admin. Dist. No. 33 v. Mr. R.*, 321 F.3d 9, 18 (1st Cir. 2003); *D.M. v. Seattle Sch. Dist.*, 170 F. Supp. 3d 1328, 1339 (W.D. Wash. 2016).

This case is closer to *Centennial* than it is to the IEP cases. In *Centennial* and here, the ALJ only ruled on the threshold issue of whether the child was disabled at all. The issue of whether a child is disabled is antecedent to the issue of whether the child (if disabled) was denied protections provided by the IDEA, a claim which the ALJ did not address. By contrast, in the IEP cases, the unexhausted claim was closely akin to the exhausted claim, differing only in the sense that time had passed and the child's situation, as is common, had changed in some respects.

Based on this persuasive authority, as well as the statutory language, I find that Count III was not exhausted.

### 3. Exceptions to Exhaustion

Courts may excuse exhaustion where, as the Parents contend here (Parents MTD Opp. at 23–27), "exhaustion would be futile or inadequate." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014). Courts must consider whether enforcing the exhaustion requirement would serve its purposes, namely "developing the record for review on appeal, encouraging parents and the local school district to work together . . . , and allowing the education agencies to apply their expertise and correct their own errors." *Batchelor*, 759 F.3d at 275 (internal citations omitted).

Exhaustion would not be futile because no ALJ has decided anything related to, or even considered evidence on, C.M.'s IEP or the Parents' unilateral decision to place him in private school—the basis of Count III. As a result, the record is not developed on issues related to Count III. Nor are those issues purely legal or closely allied to those decided by the ALJ. The Parents acknowledge as much, and contend that "a half day hearing will be necessary to provide additional evidence regarding C.M.'s current educational needs." (Parents MTD Opp. at 23; *see also id.* at 20 (proposing to rely on evidence that post-dates the administrative proceeding and is not part of record).) That evidence and those issues would be better presented to the ALJ in the first instance, as the IDEA requires. *Batchelor*, 759 F.3d at 275.[13]

The Parents' arguments otherwise are not persuasive. They argue that exhaustion would be futile because the IDEA administrative process in New Jersey has historically failed to issue decisions within the statutorily mandated timetable. (Parents MTD Opp. at 24–26.) The Parents do not cite any authority holding that a state's slow administrative process can render exhaustion futile as to an individual claim. *Compare M.M. v. Paterson Bd. of Educ.*, 736 F. App'x 317, 320 (3d Cir. 2018) (noting that while exhaustion may be excusable when

---

[13]     In that regard, it is important to distinguish between the district court's unquestioned power under IDEA to take additional evidence on issues that are properly before it, and finding (as I have) that certain issues are not properly before the district court.

plaintiffs allege systemic legal deficiencies and request system-wide relief, that rule does not apply to a claim regarding an individual student's placement). Further, while I am sensitive to the frustration of bureaucratic delays, the adjudication of Count III is not really time sensitive. The ultimate relief the Parents seek—reimbursement of private school expenses—is not jeopardized by requiring them to first use the administrative process. Because it would not be futile to first have an ALJ develop a record and review the issues presented by Count III, the Parents have not provided a reason to excuse exhaustion.

* * *

The essence of my holding is that the Parents' due process petition presented a narrow claim to the ALJ, the ALJ ruled on it, and the Parents are now trying to litigate a different, expanded claim before this Court. Enforcing the exhaustion requirement "ensures that the purpose of the IDEA remains intact," *Batchelor*, 759 F.3d at 278, by channeling the initial decision of claims to the administrators with the relevant expertise. For those reasons, I will dismiss Count III.

### E. Motion for Summary Judgment on Count IV

Finally, in Count IV, the Parents bring a claim for attorney's fees if successful on their other claims. (Am. Compl. ¶¶ 277–79.) The IDEA allows a district court "in its discretion" to award attorney's fees "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). Because the Parents' claims fail, they are not prevailing parties, so the District is entitled to summary judgment on Count IV.

**IV.    CONCLUSION**

For the reasons set forth above, I will dismiss Count III for lack of jurisdiction and grant summary judgment in favor of the District on Counts I, II, and IV. A separate order will issue.

Dated: October 27, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**